IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

CHARLES D. WHITE                                                                                    PLAINTIFF

v.                              Civil No. 05-3032

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                                                   DEFENDANT

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff, Charles D. White, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration denying his application for disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act. The court has before it the briefs submitted by the parties (Doc. 4 & Doc. 5) and the transcript of the social security proceedings.

**Procedural Background:**

White protectively filed his application for DIB on August 28, 2003. (Tr. 12, 49-51). He alleged a disability onset date of August 1, 1998, as a result of a back injury and coronary artery bypass surgery. (Tr. 13, 56).

White's application was denied initially and on reconsideration. (Tr. 20-21, 22-23). He requested a hearing before an Administrative Law Judge (ALJ). (Tr. 32). A hearing was held on July 7, 2004. (Tr. 199-224). White appeared and testified. (Tr. 207-222) He chose to proceed without counsel. (Tr. 43, 202). Paul Westberg, a vocational expert, was also called to testify. (Tr. 222-223).

Following the hearing, the ALJ secured additional evidence in the form of medical records from Dr. J. Douglas Holloway dated October 14, 2003. (Tr. 44). White was given an opportunity to make written comments or submit written questions to Dr. Holloway. (Tr. 44).

By written decision dated January 24, 2005, the ALJ found that while the evidence established the existence of severe impairments of chronic back pain with radiation to both lower extremities, chest wall pain, and stable coronary artery disease there was no medical evidence of an impairment that met or equaled one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 14). The ALJ the concluded White could not return to his past relevant work as a truck driver but had the residual functional capacity (RFC) to perform a full range of medium work. (Tr. 16). The ALJ therefore found White not disabled within the meaning of the Social Security Act. (Tr. 18).

On February 16, 2005, White requested a review on the record. (Tr. 8). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied White's request for review. (Tr. 3-6).

**Evidence Presented:**

At the July 7, 2004, hearing before the ALJ, White testified he was sixty-four and had a high school education. (Tr. 207). White testified he worked as a truck driver. (Tr. 208). He drove locally and loaded and unloaded freight. (Tr. 208). White described the work as very heavy work with the size and quantity of the freight varying greatly. (Tr. 209). He indicated the weight of the items he loaded and unloaded could vary from ten pounds to one hundred pounds or so. (Tr. 209).

AO72A
(Rev. 8/82)

White testified that prior to August 1, 1998, he was under the care of Dr. John Wilson, an orthopaedic doctor. (Tr. 210). White indicated Dr. Wilson advised him that he could not keep doing that kind of work because it would cause further injury. (Tr. 210).

White indicated he did not get any Workers' Compensation payments until after Dr. Wilson referred him to Dr. Moore, the neurosurgeon. (Tr. 210). At that time, White testified Dr. Moore indicated the MRIs had been misread and there was a ruptured disk along with swollen disks. (Tr. 210). White then had surgery in February of 1999. (Tr. 211). At some point, White began receiving Workers' Compensation benefits and eventually reached a settlement regarding benefits. (Tr. 211-212).

Following the surgery, White testified he tried to go back to work but Dr. Moore advised White there was no way Dr. Moore would release White to do any kind of a lifting job. (Tr. 212). White testified Dr. Moore told him this at the same time Dr. Moore told White to file for Social Security. (Tr. 213).

White believed the last time he had seen Dr. Moore was in May of 2000. (Tr. 213). White had not seen any other doctors about his back since then. (Tr. 213).

When asked what the problem was that kept him from being able to do any type of work, White indicated there are days he could work and days he couldn't. (Tr. 216). He indicated there are days he doesn't feel like getting out of the house because of the pain. (Tr. 216). He stated the pain goes from his back and into his legs. (Tr. 216). White, however, testified he had quit going to see a doctor after the surgery. (Tr. 216). White stated Dr. Moore had said there was not really anything else that could be done. (Tr. 216).

AO72A
(Rev. 8/82)

As far as his heart function, White testified he was doing fairly well. (Tr. 216). He understood that he wouldn't ever be one hundred percent. (Tr. 216). White testified the biggest thing is the pain and it depends on what he does. (Tr. 216).

White indicated if he gets out and does things like wash the car or just uses his arms he pays for it. (Tr. 216). In fact, he testified he had been to the doctor twice because he thought he was having a heart attack from it. (Tr. 217). White stated the pain goes down his arm and his shoulder. (Tr. 217). White indicated Dr. Holloway had stated that they might be able to correct the pain with surgery but White didn't like the idea of surgery. (Tr. 217).

Paul Westberg, a vocational expert, was also called to testify. (Tr. 222). Westberg indicated that White's past relevant work was performed at the heavy to very heavy exertional level and that White had no transferable job skills. (Tr. 223).

The medical and vocational evidence in the transcript reveals the following. On September 10, 2003, and October 3, 2003, White completed supplemental interview outlines. (Tr. 70-74, 65-69). He indicated he could bathe, dress, shave, and take care of his own hair care needs. (Tr. 70, 65). He stated he could do laundry, dishes, change sheets, iron, vacuum/sweep, take out the trash, do light home repairs, wash the car, mow the lawn with a riding mower, do some leaf raking and do light garden work. (Tr. 70, 65). He indicated he could not repair the car or appliances. (Tr. 70, 65). He indicated he could shop for groceries or clothes, do the banking, and go to the post-office. (Tr. 70, 65).

White stated he prepared several meals a week including sandwiches, frozen dinners, meats, vegetables, and desserts. (Tr. 71 (three to four meals a week), 66 (two meals a week)). Since his disability began, he indicated he could pay bills, use a checkbook, and count change.

AO72A
(Rev. 8/82)

(Tr. 71, 66). He can drive, including unfamiliar routes, and can walk for exercise or errands. (Tr. 71, 66).

At times, he uses a cane when walking for exercise. (Tr. 66). He also uses a back brace part of the time. (Tr. 71).

He stated he spent his time attending church, watching television, listening to the radio, reading, and visiting friends and relatives. (Tr. 71, 66). He indicated he occasionally camps out using his travel trailer locally. (Tr. 71, 66). He stated he was forced to quit his job or had been fired because he was unable to lift and move heavy objects/freight. (Tr. 71, 66).

He indicated he suffers from unusual fatigue and has to rest once a day for approximately an hour. (Tr. 72, 67). When asked to describe his pain or other symptoms, White responded: "Back & Leg Pain from injury & Surgery. Left Chest & Shoulder from Heart Surgery." (Tr. 67). *See also* (Tr. 72 ("Back & Legs Pain–Back Surgery. Chest & Rib Pain–Heart Surgery.")).

He stated the pain is continual but worse when he was physically active such as when he bends or lifts. (Tr. 72, 67). He indicated he can stand fifteen minutes and sit thirty minutes before the pain occurs. (Tr. 67). He stated standing any length of time or driving very long made the symptoms worse as does bending or lifting. (Tr. 72, 67). Walking, however, helped moderate the pain. (Tr. 67).

White indicated that other than medication walking and rest helped with the pain. (Tr. 72, 67). On an average day, White indicated he tries to walk one to two miles and does some light chores around the house, yard, and garden. (Tr. 73, 68). He also stated he helped his wife do the shopping for groceries, etc. (Tr. 68).

White had five-vessel coronary artery bypass grafting in 1993. (Tr. 14, 152). He was seen by Dr. Gary Collins at the Arkansas Cardiology Clinic on July 9, 1997. (Tr. 152). Note was made that White had been doing well with only intermittent chest pain. (Tr. 152). He was scheduled for a stress thallium test in anticipation of possible back surgery. (Tr. 152).

Dr. Collins saw White on August 13, 1997. (Tr. 151). White denied any cardiac complaints. (Tr. 151). A treadmill test was performed and was relatively normal. (Tr. 151). Dr. Collins listed his final diagnostic impression as: coronary artery disease and some stable intermittent chest pain with relatively normal thallium indicating good prognosis. (Tr. 151).

On May 11, 1998, White was seen by Dr. Collins. (Tr. 150). White was complaining of hard beating of the heart and associated left anterior chest pain which radiated up his neck. (Tr. 150). He also indicated he had occasional blurred vision. (Tr. 150). Dr. Collins placed White on a Holter monitor due to the palpitations and also scheduled a nuclear coronary perfusion imaging study. (Tr. 150).

On May 13, 1998, a nuclear coronary perfusion imaging study was done by Dr. J. Douglas Holloway on White. (Tr. 148). Dr. Holloway noted normal appearing nuclear coronary perfusion images. (Tr. 148). White also wore a Holter monitor for thirty-six hours. (Tr. 149). The results were unremarkable. (Tr. 149).

On November 17, 1998, White was seen by Dr. Holloway. (Tr. 147). White was not having any chest pain, weakness, dizziness or syncope. (Tr. 147).

On May 18, 1999, White was seen by Dr. Holloway. (Tr. 146). White indicated he had occasional chest pain, but not bad. (Tr. 146). He reported no new onset of any problems and denied any palpitations. (Tr. 146). Dr. Holloway noted that White had extensive coronary

AO72A
(Rev. 8/82)

disease, status post-op coronary bypass in 1993, but was doing well with only rare atypical chest pain. (Tr. 146).

On November 16, 1999, a nuclear coronary perfusion imaging study was done by Dr. Holloway on White. (Tr. 145). The diagnostic impressions from this test were listed as follows: 1. Adequate functional capacity with no subjective evidence of ischemia at moderate workload; 2. ST segment depression with exercise, of uncertain clinical significance; 3. Heart rate response to exercise blunted by residual beta-blocker effect; 4. Slightly abnormal nuclear coronary perfusion images demonstrating a tiny fixed inferobasal perfusion defect without evidence of ischemia; and 5. The calculated left ventricular ejection fraction is 49%. (Tr. 145).

On November 2, 2000, a nuclear coronary perfusion imaging study was done by Dr. Holloway on White. (Tr. 144). The diagnostic impressions from this test were listed as follows: 1. Fair functional capacity with no subjective evidence of ischemia at moderate workload; 2. ST segment depression with exercise, of doubtful clinical significance; 3. Normal appearing nuclear coronary perfusion images; and 4. The calculated left ventricular ejection fraction is 46%. (Tr. 144).

On November 7, 2001, a nuclear coronary perfusion imaging study was done by Dr. Holloway on White. (Tr. 143). The diagnostic impressions from this test were listed as follows: 1. Fair functional capacity; 2. Heart rate response to exercise somewhat blunted by residual beta-blocker therapy; 3. Normal appearing nuclear coronary perfusion images; and 4. The calculated left ventricular ejection fraction is 58%. (Tr. 143).

On September 27, 2002, White called Dr. Holloway's office complaining of left chest pain with exertion. (Tr. 142). He was told to go to the emergency room. (Tr. 142). On October

AO72A
(Rev. 8/82)

15, 2002, a nuclear coronary perfusion imaging study was done by Dr. Holloway on White. (Tr. 141). The diagnostic impressions from this test were listed as follows: 1. Fair functional capacity with no subjective evidence of ischemia at moderate workload; 2. ST segment depression with exercise, of uncertain clinical significance; 3. Essentially normal appearing nuclear coronary perfusion images; and 4. The calculated left ventricular ejection fraction is 56%. (Tr. 141).

White was seen by Dr. Holloway again on October 14, 2003. (Tr. 170). White complained of pain across his chest to his left shoulder and indicated it hurt constantly. (Tr. 170). However, he stated it did not feel like "chest pain." (Tr. 170).

White reported walking two miles on most days. (Tr. 170). White was diagnosed with atypical chest pain possibly due to some type of inflammatory disorder or perhaps related to a sternal wire from White's surgery. (Tr. 170). White was given a trial of Vioxx and if the discomfort continued was going to be asked to see Dr. Ransom regarding the possibility of removal of the sternal wire. (Tr. 170). A nuclear coronary perfusion study done that same day showed fair functional capacity with no subjective or clear ECG evidence of ischemia at moderate workload; essentially normal appearing nuclear coronary perfusion images; and the calculated left ventricular ejection fraction was 57%. (Tr. 171).

On February 20, 1997, White injured his back when he fell on a slick concrete floor. (Tr. 197). Following the fall, White complained of pain in his right lower extremity that radiated from the hip to the lateral aspect of the ankle and occasional pain in the anterolateral aspect of the left thigh. (Tr. 197). White was treated with anti-inflammatory agents and analgesics without significant relief. (Tr. 197).

AO72A
(Rev. 8/82)

On April 7, 1997, White was seen complaining of pain radiating from the hip to the lateral aspect of the ankle without associated numbness. (Tr. 197). Dr. Jay Lipke noted that White's examination revealed a good range of motion of his back. (Tr. 197). White had a negative straight leg raising test, no neurologic deficit in the lower extremities, and x-rays of his lumbar spine showed no abnormalities. (Tr. 197). Dr. Lipke indicated he believed White had a lumbar nerve root compression causing his symptoms. (Tr. 197). A CT of White's pelvis was unremarkable. (Tr. 197-198).

On April 10, 1997, an MRI of White's lumbar spine showed minimal bulging at L4/L5. (Tr. 196). No other abnormality was detected. (Tr. 196).

In April through June of 1997, White underwent a series of lumbar epidural steroid injections. (Tr. 192-195). On June 23, 1997, White was seen by Dr. Wilson complaining of persistent back and leg pain. (Tr. 191). Examination revealed restriction of motion, muscle spasm, with positive straight leg raising. (Tr. 191). Note was made of the fact that the MRI had revealed degenerative changes but no large disc. (Tr. 191).

On August 27, 1997, Dr. Wilson saw White who was complaining of an exacerbation of his low back pain. (Tr. 190). White was having considerable pain in both legs. (Tr. 190). Examination revealed a restriction of motion and positive straight leg raising without neurological deficit. (Tr. 190). On March 11, 1998, Dr. Wilson noted that White had been sent for a warm-n-form brace with padding. (Tr. 189).

An MRI of White's lumbar spine was done on October 8, 1998. (Tr. 187). The MRI showed facetal hypertrophy at the L3/L4, L4/L5, and L5/S1 levels. (Tr. 187). There was mild foraminal narrowing at the L3/L4, L4/L5, and L5/S1 levels. (Tr. 187). Note was made of the

AO72A
(Rev. 8/82)

fact that there was little change from the earlier MRI. (Tr. 187). On October 14, 1998, Dr. Wilson noted the MRI did not reveal a huge disc but White continues to have sciatica on the right (Tr. 186).

Dr. Wilson referred White to Dr. Jim J. Moore, a neurosurgeon. White was seen by Dr. Moore on the following occasions:

> October 26, 1998. White referred for a neurological evaluation by Dr. John Wilson. White's problems began on February 2, 1997, when he slipped on a wet concrete landing heavily. Since that time has low back pain with radiation into the right lower extremity primarily in the lateral calf. He has more leg than back pain. Heel and toe gait is well preserved. No evidence of atrophy, atony or fasciculations in any of the muscle groups. His reflexes are nicely perceived at all levels. His straight leg raising is excellent. He has tenderness in the sacrosciatic notch. Back range motion is uncomfortable in right lateral bending and hyperextension. Both ranges are not particularly restricted. Review of the MRI suggests degenerative hypertrophy and some disk bulge at L4/5. I would be a bit more suspicious at the L3/4 on both the sagittal as well as the axial views. I believe a lumbar diskography should be done at the L3/4 and L4/5 levels. (Tr. 116).

> November 18, 1998. White seen in followup. Diskography performed. The L4-5 disc was done transdurally and showed evidence of disc degeneration, but no evidence of herniation, nor did it create any pain in the patient. However, the L3-4 diskogram did precipitate pain in the right thigh upon injection of the radiopaque media. There was evidence also of an annular tear with the contrast continuing into the posterior longitudinal ligament and to the left. White continues to complain of pain primarily in the right lower extremity. He finds he must keep the leg flexed and elevated to avoid rather excruciating, aggravating pain, more than the constant pain of which he complains. The patellar reflex remains good. He may be a candidate for a decompression at the L3-4 level on the right side. I want White to see Dr. Wilson again and would like to review the diskogram with Dr. Wilson. (Tr. 115).

> February 9, 1999. Talked to White in detail about the surgery. Conjoint procedure scheduled with Dr. Wilson. (Tr. 114).

> February 11, 1999. Operative procedure. A right partial decompressive hemilaminectomy, medial facetectomy, foraminotomy diskectomy, fatty graft by microsurgical technique. (Tr. 113). *See also* (Tr. 120-122 operative report).

-10-

March 3, 1999. White is doing well. Feels tender in the back but his ability to sleep at night is much improved. He is taking no medication. His reflexes are okay and his straight leg raising is carried out very nicely. The incision line is healing nicely. There is some subcutaneous fluid collection in the lower part of the incision that should subside and resorb. He will continue his walking program with no more than a mile with each excursion. (Tr. 113).

March 24, 1999. White is doing well. He has some discomfort but not to the extent experienced pre-operatively. He is sleeping well. He takes Extra Strength Tylenol occasionally. His straight leg raising is excellent as are his reflexes. (Tr. 112).

April 27, 1999. White has a feeling of numbness in the lateral aspect of the right calf and occasional sharp pain in the right groin. He is sleeping well. He is taking Extra Strength Tylenol on occasion. His straight leg raising is good. His reflexes are symmetrical. He does have sensory change in the lateral calf. I'm going to release him to return on an as needed basis. His response to the surgery to this date appears to be quite good. White will be progressing his activity levels. His healing period will likely be at least another month. He is still restricted as far as his physical activity levels. (Tr. 111).

July 28, 1999. White is doing fairly well, only occasional pains in the right lower extremity and still an occasional numbness. Generally doing well on over-the-counter medications. I feel the patient is at the end of his healing period. He has some residuals from a surgically operated disk at the L3/4 level and I believe that this would carry a disability rating of 10% permanent partial to the body as a while. He is to return on an as needed basis. (Tr. 110).

March 21, 2000. White is having some difficulty. He tends to be very stiff and it takes a great deal to loosen him up first thing in the morning. He is having some radiational pain into the left lower extremity and does have occasional pain in the right lower extremity, the site of primary difficulties. The patellar reflexes are well perceived as are the achilles. His straight leg raising is uncomfortable at extremes. I believe White might benefit from the use of an electric muscle stimulator, an RS4M device. The patient's musculature is deconditioned and I believe the RS4M device would offer some benefit in conditioning. White also raises the question as to possible Social Security eligibility and it would certainly be proper for him to apply for Social Security Benefits. (Tr. 109).

April 18, 2000. White feels significantly benefitted by the RS4M device. He is able to sleep through the night without waking. He still has some discomfort during the day with certain physical levels of activity. (Tr. 108).

AO72A
(Rev. 8/82)

> April 25, 2000. White has been using the RS4M neuromuscular therapy device for rehabilitation which has helped alleviate painful symptoms due to a diagnosis of lumbar radiculitis and deconditioning of the paraspinal muscles (disuse atrophy). With the device, White has experienced an increased range of motion, sleeps better at night due to relaxing of the muscles, and there has been a decrease in continuing atrophy of the lumbar paraspinal muscles. (Tr. 107).
>
> May 30, 2000. Doing well with RS4M device and occasional use of over-the-counter ES Tylenol. On no other medication and is able to sleep well. Nothing else to recommend at this point except ongoing use of the device. White asked to come back either in six months or on a prn basis. (Tr. 106).

On December 15, 2003, White underwent a general consultative physical examination performed by Dr. K. Simon Abraham. (Tr. 153-159). White complained of pain in the right thigh, leg, and back and chest wall radiating from the left upper chest to the left shoulder. (Tr. 153-154). White reported being able to care for himself, drive, and being able to walk a mile at moderate pace. (Tr. 153).

Upon physical examination, White's range of motion in his cervical spine was within normal limits. (Tr. 156). Flexion in his lumbar spine was noted to be 0-70%. Range of motion in his extremities was normal except for some limitations in flexion in his hips which was noted to be 0-90%. (Tr. 156).

White's neurological examination was normal. (Tr. 157). His gait and coordination was normal. (Tr. 157). There were no limitations on his limb function. (Tr. 157). Dr. Abraham listed his diagnostic impressions as: (1) chest wall pain with a history of coronary artery grafts; (2) radiculopathy, right leg and thigh. (Tr. 159).

On January 7, 2004, Dr. R.W. Beard, a medical consultant, completed a residual physical functional capacity assessment on White. (Tr. 160-167). With respect to exertional limitations,

-12-

it stated White could occasionally lift or carry fifty pounds; could frequently lift or carry twenty-five pounds; could stand or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and his ability to push and pull was unlimited other than as show for lift and/or carry. (Tr. 161). No postural, manipulative, visual, communicative, or environmental limitations were established. (Tr. 162-164).

It was noted that the symptoms were attributable to a medically determinable impairment. (Tr. 165). At that time, there was no treating or examining source statement regarding White's physical capacities in the file. (Tr. 166).

On February 7, 2005, Dr. Holloway wrote a letter that stated that as of October 14, 2003, White was no longer allowed to lift more than 10-20 pounds due to his prior heart surgery. (Tr. 178). Dr. Holloway stated the limitation would be permanent. (Tr. 178).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the

AO72A
(Rev. 8/82)

evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

White argues remand is necessary because the ALJ failed to develop the medical evidence of residual functional capacity. White's arguments are premised primarily on the following: (1) the February 7, 2005, letter from Dr. Holloway in which he opined that as of October 14, 2003, White was no longer allowed to lift more than ten to twenty pounds due to his prior heart surgery; (2) the fact that the nuclear coronary profusion imagining studying done on October 14, 2003, revealed White only had a fair functional capacity with no subjective or clear ECG evidence of ischemia at moderate workload; (3) Dr. Moore's statement in March of 2000 that it would be proper for White to apply for Social Security benefits; and (4) Dr. Moore's statement in April of 2000 that White still had some discomfort along during the day especially with certain physical levels of activity.

We reject White's argument. First, with respect to Dr. Holloway's letter of February 7, 2005, we note that the coronary by-pass surgery was performed in 1993. (Tr. 152). While the transcript does not contain the records regarding the surgery or of White's cardiology care until 1997 when he began being seen at the Arkansas Cardiology Clinic, there is nothing in the records indicating that at any time prior to the letter being written on February 7, 2005, that Dr. Holloway, or any other cardiologist, placed any physical restrictions on White. (Tr. 141-152). Dr. Holloway's own records from his October 14, 2003, and other office visits with White contain no mention of any physical restrictions on White and certainly contain no mention of any lifting restriction. (Tr. 141-152, 170-172). A nuclear coronary perfusion imaging study done on October 14, 2003, revealed fair functional capacity with no subjective or clear ECG evidence of ischemia at moderate workload, normal appearing images, and a left ventricular ejection fraction

of 57%. (Tr. 171). There is no indication in the records that White was even seen by Dr. Holloway between October 14, 2003, and the date the letter was written, February 7, 2005.

We also reject White's argument that the case needs to be remanded for an explanation of what "fair functional capacity" and "moderate work load" means. The chest pain White was experiencing was non-cardiac inflammatory chest wall discomfort possibly due to a sternal wire. (Tr. 170). White testified he was doing fairly well as fair as his heart function went and that Dr. Holloway believed surgery could alleviate the non-cardiac chest pain White was experiencing. (Tr. 216-218). However, White was reluctant to have surgery performed. (Tr. 216-218).

Although White was followed by a cardiologist including nuclear coronary perfusion imaging studies being performed annually, no further surgical or other invasive treatment has been necessary. Dr. Holloway's records indicate White was doing well, his coronary artery disease was stable, and he had no subjective evidence of ischemia at a moderate workload and essentially normal appearing nuclear coronary perfusion images. The only medication prescribed by the cardiologist has been Atenolol and an Aspirin a day. *See e.g.,* (Tr. 150). Tests performed resulted in essentially normal results.

Second, with respect to Dr. Moore's remark that it would be appropriate for White to apply for Social Security benefits, we find this statement to be of no significance in the evaluation of the medical evidence of White's residual functional capacity. Nor do we believe the ALJ had any duty to develop the record because of Dr. Moore's statement in April of 2000 that White still had some discomfort along during the day especially with certain physical levels of activity.

Dr. Moore's records indicate White was doing well, had definitely improved after using the electric muscle stimulator, and his reflexes were symmetrical and straight leg raising was good.

AO72A
(Rev. 8/82)

White was taking only occasional over-the-counter medication and was told to return to see Dr. Moore on an as needed basis. As of the July 7, 2004 hearing, White had not seen Dr. Moore or any other doctor regarding his back since May of 2000. (Tr. 213).

The ALJ had a duty to fully and fairly develop the record. *Freeman v. Apfel,* 208 F.3d 687, 692 (8th Cir. 2000). This duty includes an obligation to ensure the record contains evidence from the treating physician, or at least an examining physician, regarding the impairments at issue. *Strongson v. Barnhart*, 361 F.3d 1066, 1071-72 (8th Cir. 2004).

Following the hearing, we note the ALJ obtained additional records from Dr. Holloway. (Tr. 44). These records are the medical records dated October 14, 2003, from the White's visit that day and the nuclear coronary perfusion imaging study done that day. (Tr. 170-171). These records were discussed and considered by the ALJ. (Tr. 15). While there are circumstances when the ALJ is required to more fully develop the record regarding what test results, among other information, mean relative to the claimant's ability to work, *see e.g., Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)("An administrative law judge may not draw upon his own inferences from medical reports."), we do not believe this is one of those situations.

In this case, the ALJ had not only the results of the tests but also the treating cardiologist's diagnostic impressions of the tests and his office notes from visits with the claimant on the same dates. "[T]here was substantial evidence in the record to allow the ALJ to make an informed decision." *Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001). A consultative general physical examination was ordered and the ALJ had the records from White's treating cardiologist, neurosurgeon, and orthopedic doctor. The ALJ had the testimony of the plaintiff and the testimony of a vocational expert with respect to the exertional level of White's past

relevant work. In short, "[t]he record contained substantial evidence to support the ALJ's decision." *Id.*

"Furthermore, 'reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial.' " *Id. See also Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993). White has made no such showing.

White next argues that the ALJ erred in concluding he had the RFC to perform the full range of medium work. White, relying on the Dictionary of Occupational Titles, which he contends shows driving truck is considered medium work, argues if he cannot be a truck driver, he cannot do a full range of medium work. He then notes that the lifting limitation placed on him by Dr. Holloway (ten to twenty pounds maximum) is inconsistent with the ability to perform medium work. Finally, he notes that the fact that he has some back discomfort along with certain physical levels of activity is inconsistent with his ability to be on his feet for six out of eight hours a day and to lift twenty-five pounds up to two-thirds of the day and fifty pounds up to one-third of the day.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id*. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001).

AO72A
(Rev. 8/82)

Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect [her] RFC." *Id*.

In this case, the ALJ determined that White could not perform his past relevant work as a truck driver. This determination was based on White's testimony and that of the vocational expert indicating White's past relevant work as a truck driver was performed at a heavy or very heavy exertional level. (Tr. 16-17, 209, 223). *Melton v. Apfel*, 181 F.3d 939, 942 (8th Cir. 1999)("Tractor driving is characterized as medium or heavy work, *see Dictionary of Occupational Titles (DOT)* § 929.683-014, § 409.683-010 (4th ed. rev.1991), and work that involves lifting the weights mentioned is classified as heavy work, *see* 20 C.F.R. § 404.1567(d)"). Thus, the conclusion that White could not return to his past relevant work is not inconsistent with a conclusion that he retained the RFC capacity to perform a full range of medium work.

"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404. 1567(c). *See also Dixon v. Barnhart* 324 F.3d 997, 1001 (8th Cir. 2003). In determining White's RFC, the ALJ carefully reviewed the medical records, plaintiff's subjective complaints, the plaintiff's testimony regarding his activities, and materials White submitted to the Commissioner including a supplemental interview outline and disability report he completed. As noted above, the ALJ carefully explained his reasons for discounting White's testimony regarding the disabling nature of his physical limitations and associated pain. The medical evidence does not support a finding

-19-

of greater functional limitations than those found to exist by the ALJ. In fact, the medical findings do not support any restrictions on White that would be inconsistent with this RFC.

**Conclusion**:

For the reasons stated, I recommend that the decision of the Commissioner be affirmed and this case dismissed. **The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Dated this 5th day of July 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)